# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                )

**SHIRLEY M. MILES,**           )
                                )

    **Plaintiff,**              )
                                )

        **v.**                 )       **Civil Action No. 10-2092 (ESH)**
                                )

**JOHN F. KERRY, in his official capacity as**  )
**Secretary of State,**            )
                                )

    **Defendant.**           )
_____  )

## <u>MEMORANDUM OPINION</u>

Plaintiff Shirley M. Miles is an African-American female who was formerly the head of an entity known as "Internal Review and Operations Research" ("IROR") in the Department of State's Bureau of Overseas Buildings Operations ("OBO"). She brings this action against John F. Kerry, in his official capacity as Secretary of State ("Defendant"), alleging race discrimination, sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16. (Second Amended Compl. ¶¶ 37-59, Aug. 7, 2012 ("2d Am. Compl.").) Defendant has filed a motion for summary judgment. (Def.'s Mot. for Summ. J., Oct. 16, 2012 ("Def.'s Mot.").) For the reasons stated herein, defendant's motion will be granted in part and denied in part.[1]

_____

[1] In ruling on defendant's motion for summary judgment, the Court has considered the following: Defendant's Memorandum of Points and Authorities in Support of its Motion for Summary Judgment, Oct. 16, 2012 ("Def's Mem.") [ECF No. 21]; Defendant's Statement of Material Facts Not In Genuine Dispute, Oct. 16, 2012 ("Def.'s Facts") [ECF No. 21]; Defendant's Exhibits in Support of Defendant's Motion for Summary Judgment, Oct. 17, 2013 ("Def.'s Ex.") [ECF No. 22-1 to 22-5]; Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Feb. 25, 2013 ("Pl.'s Opp.") [ECF No. 29]; Plaintiff's Response to

# BACKGROUND

## I. FACTS

OBO is the State Department bureau responsible for building and maintaining facilities overseas for the conduct of U.S. diplomacy, including embassies and consulates, office buildings and residences.  (Def.'s Facts ¶¶ 1, 4.)  OBO first hired plaintiff in September 2002 as a "nonsupervisory management analyst" in its "Management Support Division" ("MSD").  (*Id.* ¶ 4.)  In January 2003, then-OBO Director, General Charles Williams, selected plaintiff to head IROR, an entity he had created in 2001 to conduct internal reviews that would provide him with "independent assessments of programs, operations and personnel matters."  (*Id.* ¶¶ 2, 5 (internal quotations omitted).)  External reviews of OBO were carried out by the State Department's Office of Inspector General ("State OIG") and the Government Accountability Office ("GAO").  (*Id.* ¶ 3.)  For the duration of Williams' tenure as OBO Director, plaintiff reported directly to him, as did the heads of two "divisions," the "Information Resource Management Division" ("IRM") and the "Management Support Division" ("MSD").  (*Id.* ¶ 5.)

Plaintiff was initially the only person assigned to IROR, but she was given the authority to hire staff, which she did.  (Def.'s Facts ¶ 4; Pl.'s Facts ¶ 4.)  During this period plaintiff's "job title" and "position description" changed twice.  First, upon her move to IROR, her job title

---

Defendant's Statement of Material Facts Not In Genuine Dispute and Plaintiff's Statement of Genuine Issues, Feb. 25, 2013 ("Pl.'s Resp." (pp. 1-25) and "Pl.'s Facts" (pp. 25-36) [ECF No. 29-1]); Plaintiff's Exhibits in Support of Opposition to Summary Judgment (Exhibits 1-35), Feb. 25, 2013 ("Pl.'s Ex.") [ECF Nos. 29-2 to 29-6]; the Declarations of Shirley Miles ("Miles' Decl."), Jane Loyer ("Loyer Decl.") and Shawnee Wright ("Wright Decl.") [ECF Nos. 29-7 to 29-9]; Deposition Transcripts from Isaias Alba ("Alba Dep."), Shirley Miles ("Miles Dep.") Jurg Hochuli ("Hochuli Dep."), Richard Shinnick ("Shinnick Dep.") and Ramsey Stallman ("Stallman Dep.") [ECF No. 29-10 to 29-15]; Defendant's Reply In Support of Motion for Summary Judgment, May 7, 2013 ("Def.'s Reply") [ECF No. 34]; Defendant's Response to Plaintiff's Statement of Genuine Issues, May 7, 2013 ("Def.'s Resp.") [ECF No. 34-1]; and Defendant's Exhibits to Reply (Exhibits 51-53) ("Def.'s Ex.") [ECF No. 34-2].

changed to "program analyst," and she was assigned a new position description. (Def.'s Facts ¶¶ 5, 6; Pl.'s Facts ¶ 3.) Then, in July 2006, her job title changed to "supervisory program analyst," and her position description was revised. (Def.'s Facts ¶ 7.) Despite differences among her various job titles and position descriptions, each position plaintiff held was classified as GS-14, with no promotion potential. (*Id.* ¶¶ 4-7.)

The events that precipitated the current litigation began in January 2008, when Richard Shinnick replaced Williams as OBO Director and State OIG initiated its first inspection of OBO in 15 years. (*Id.* ¶ 8.) State OIG "conducts periodic inspections of State bureaus to determine whether they are achieving departmental policy objectives, efficiently managing resources, and implementing adequate controls to guard against waste, fraud or abuse." (*Id.*) The OIG's final report, which was released in August 2008, identified several problems with OBO's "unorthodox and overly complex" organizational structure, noting the fact that two divisions (MSD and IRM) reported directly to the OBO Director instead of to an "executive director" or "principal deputy assistant secretary." (Def. Ex. 3, at 5 ("OIG Report")[2]; Def.'s Facts ¶¶ 9-10.) The OIG Report also found fault with the Williams's management style, the "secretive" nature of IROR's work, and "inaccuracies" in IROR's work product, and recommended that OBO "develop a mission statement and formal operating procedures for the conduct of [IROR's] activities" and "provide [IROR] office personnel with the requisite training to perform its oversight function."[3] (OIG Report at 6-7; Def.'s Facts ¶¶ 11-13.)

---

[2] The OIG Report erroneously stated that the "Human Resources Division" ("HR") also reported directly to the OBO Director. (Def.'s Facts ¶ 10; Pl.'s Resp. ¶ 10.)

[3] Plaintiff disputes the accuracy of OIG's conclusions, but not that the language appears in the OIG Report. (Pl.'s Resp. ¶¶ 9-12.)

After receiving the 2008 OIG Report, OBO Director Shinnick made several changes that affected IROR and plaintiff. (Def.'s Facts ¶¶ 17-21.) First, Shinnick decided that IROR would no longer report directly to him. (*Id.* ¶ 20.) He consulted with the head of the Resource Management Division ("RM"), Jorg Hochuli asking him where he thought IROR should be moved. (*Id.*; Def.'s Ex. 12.) Hochuli recommended that IROR be moved into RM,[4] explaining his reasoning in a memo to Shinnick:

> Per your question as to where the Internal Review and Operations Research (IROR) entity would best fit within OBO organizational structure. I believe that RM is the logical office to assume [the IROR] function. Historically, the Resource Management Office (RM) has had such a function within the Policy and Programming Division (RM/P). RM/P is currently overseeing the Federal Managers' Financial Integrity Act (FMFIA) management controls audit. With [its] financial audit program, and more recently the Department's increased emphasis on A-123 Internal Controls on Financial Transactions, the Financial Management Division (RM/FM) is also heavily involved in such internal review functions.

> Accordingly, I would recommend that the IROR function be placed in the RM office with reporting responsibilities through the RM Managing Director. This realignment in no way prevents the Director from requesting audits and reviews to be performed through a tasking to the RM office. It would also allow for the synergy as RM is also responsible for coordination of OIG and GAO audits, responding to stakeholders['] requests for information, performing financial audits overseas, FMFIA management controls reviews, A-123 reviews, and interfacing with Charleston on the Department's audited Financial Statements.

> Within RM, the IROR function will report to the Deputy Managing Director, allowing it to perform reviews throughout the organization as well as within RM.

(Def.'s Ex. 12, at 1-2.) Shinnick followed Hochuli's recommendation and moved IROR into RM and directed plaintiff to report to RM's deputy managing director, Ramsay Stallman. (Def.'s

---

[4] Hochuli's actually believed that IROR should continue to report to the OBO Director to maintain its independence, but Shinnick had already rejected that option. (Pl.'s Resp. ¶ 20; Pl.'s Facts ¶ 17.)

Facts ¶¶ 20-21.)  At the same time as he moved IROR, Shinnick moved the two divisions that had been directly reporting to him, MSD and IRM, under a newly created "Office of the Executive Director."[5]  (*Id.* ¶ 18.)  Shinnick also made several non-structural changes that affected plaintiff.  He "cut back on the number and size of weekly meetings," discontinuing the "top team" meetings that the former OBO Director had held each Friday afternoon and informing plaintiff and the division heads that they were no longer required to attend project performance review, cross-cutting and senior staff meetings.[6]  (*Id.* ¶ 19.)

Although the changes described above took effect in August 2008 or shortly thereafter, OBO did not submit its request for approval of the structural changes to the State Department's Bureau of Human Resources ("State HR") until January 29, 2009.[7]  (Def.'s Ex. 19 & Pl.'s Ex. 9[8]; Def.'s Facts ¶¶ 22, 26.)  By that time, OBO had decided to propose that IROR be reclassified as

_____

[5] At the time these changes took place, the head of one division (IRM) was Robert Clarke, a white male; and the head of the other division (MSD) was Roberto Coquis, a Hispanic male. Both Clarke and Coquis were GS-15's.  (Def.'s Facts ¶ 18; Pl.'s Resp. ¶ 18.)  Shinnick also moved OBO's Human Resources Division ("HR") under the Office of the Executive Director. The head of HR was Carmen Montgomery, an African-American female.  (Def.'s Facts ¶ 18.)

[6] Although at the time plaintiff expressed her approval of IROR's move into RM, she now maintains that she did so only because it "was a done deal" and that she was trying "to make it work."  (Pl.'s Resp. ¶ 21 (quoting Miles Dep. at 135-37).)

[7] At the same time, OBO sought approval to change its "organizational structure nomenclature to match" the rest of the State Department.  (Def.'s Exs. 19-20.)  As applied to OBO, that meant that the Bureau (OBO), was headed by a Director (Shinnick), under which there are Directorates (*e.g.*, RM), which are headed by a Deputy Director (*e.g.*, Hochuli), followed by Offices (*e.g.*, RM/P or the "Office of the Executive Director"), which are headed by Office Directors (*e.g.*, Alba), followed by Divisions, Branches, Sections (all headed by Chiefs) and then Staff, which is headed by a Supervisor.  (Def.'s Ex. 20; Pl.'s Ex. 31.)  Also, by that time, IROR's name had changed to "Internal Reviews" ("IR"), but the Court will follow the parties' lead and continue to refer to it as IROR, although it should be noted that it is referred to as IR in several exhibits which have been quoted herein.

[8] Several of plaintiff's exhibits are duplicates of defendant's exhibits.  Where that is the case, the first citation will include both exhibit numbers, but thereafter the Court will cite only to defendant's exhibit number.

a "division" that would report to the Office of the Executive Director. (Def.'s Ex. 19.) IROR did not meet the State Department's requirements to be classified as a "division," so OBO also requested a waiver of those rules as applied to IROR. (Def.'s Ex. 19; Def.'s Facts ¶¶ 23; Pl.'s Facts ¶ 13.) In seeking the waiver, OBO described IROR as "a separate functional group within OBO for eight years," which "should remain a distinct entity, because it has an oversight function within the bureau; it conducts independent and objective reviews and analysis of the Bureau's operations," and "[[i]n order to conduct much of the research, it often interacts with Bureau senior management, which is best facilitated by a Division status and by a Division Chief." (Def.'s Ex. 19, at 3; Def.'s Facts ¶ 26; Pl.'s Facts ¶ 13.)

On February 11, 2009, State HR notified OBO that, after reviewing OBO's "final realignment organization charts" and the "waiver requests," it had concluded that "[IROR] should be organized as a Staff, not a division." (Def.'s Ex. 20 & Pl.'s Ex. 11, at 1-2; Def.'s Facts ¶¶ 27, 50.) State HR further "recommend[ed] that the IR Staff be placed with the RM Office of Policy and Program Analysis [RM/P] or with the RM Deputy Director [Hochuli]" because "[p]lacement with the Executive Director is inappropriate due to a conflict of interest when reviewing HR, Management Support [MSD], or IRM operations." (Def.'s Ex. 20, at 2; Def.'s Facts ¶¶ 27, 50; Pl.'s Facts ¶ 14.)

Although neither Shinnick nor Hochuli believed there would have been an unavoidable conflict of interest if IROR reported directly to the Executive Director (Pl.'s Facts ¶¶ 15-16), Hochuli decided that, effective March 2, 2009, IROR would be incorporated into RM/P as a Staff. (Def.'s Ex. 21 & Pl.'s Ex. 8; Def.'s Facts ¶ 28.) With IROR part of RM/P, plaintiff would report to RM/P's Director, Isaias ("Cy") Alba. (Def.'s Facts ¶ 28.) On February 23, 2009, Hochuli sent a memo to plaintiff, Alba, and Stallman, who by then had moved into the position

of Executive Director, notifying them of his decision to move IROR into RM/P and asking

plaintiff to "work with [Stallman] and [Alba] to ensure a smooth transition." (Def.'s Ex. 21.) In

that memo, Hochuli explained his decision as follows:

> Following [State HR's] recommendation, I have decided to incorporate IROR into RM/P. Further since RM/P has an OMS [office support staff], the office support position currently in IR will be reassigned to the EX Director which does not currently have an OMS and needs the support.

(*Id*.) That same day, plaintiff sent a memo to Hochuli questioning his decision and explaining

the reasons for her objection to moving IROR into RM/P:

> I am not comfortable at this time to work for CY Alba. An important reason is that my talented staff has been in constant upheaval now for over a year. . . .

> My staff has been very rattled by all the unexpected changes. . . . Additionally, there is the added worry of the delicate situation with CY's dubious reputation for managing women working for him. CY is known to be openly critical of IR. I need to wait out the results of the desk audit. These constant changes in my program put my promotion in great jeopardy. I want to stay put for now. . . .

> You mentioned in your memo that placement in the EX is inappropriate due to conflict of interest when reviewing HR, MSD, or IRM operations. IR is the bureau's oversight apparatus in [] reviews and analysis. Most importantly, there is an inherent conflict of interest with IR being placed under RM period. IR should report directly to the head of the bureau as it was previously.

> I am requesting that IR be placed back under the Director of OBO.

(Pl.'s Ex. 34, at 1-2.) The move took effect as contemplated on March 2, 2009. (Def.'s Facts ¶

28.) On March 5, 2009, Hochuli sent a memorandum to plaintiff which stated:

> This is in response to your memo dated February 23, 2009. Although I understand your concerns, the realignment is for legitimate business reasons and is moving forward as planned. The realignment of IR to RM/P is effective March 2, 2009.

> I appreciate your cooperation in making this move a success. Please note that failure to move as requested may result in disciplinary action. I trust that such action will not be necessary, however.

(Pl.'s Ex. 13, at 22.)

During the same time period as OBO was making organizational changes, plaintiff was seeking a promotion to GS-15, which she believed that former OBO Director Williams had promised her. (Def.'s Facts ¶¶ 35-49; Pl.'s Resp. ¶¶ 35-49.) Plaintiff was pursuing two possible avenues to obtain her promotion. (Pl.'s Facts ¶¶ 8-10; Def.'s Resp. ¶¶ 8-10.) First, she was working with Stallman and others on a proposal for the reorganization of IROR, which would make the head of IROR a GS-15 position.[9] (Def.'s Ex. 38 & Pl.'s Ex. 3, at 1-2; Pl.'s Facts ¶¶ 8-12.) That proposal was finalized and submitted to the classification staff at State HR for review on October 28, 2008. (Def.'s Facts ¶ 38, at 1.) According to Stallman, plaintiff would have to "compete" for the new GS-15 position against other applicants because the position description was based on "projected," not current duties. (*Id*.) At the same time, plaintiff requested a "desk audit," to see whether the work she was already doing entitled her to a GS-15 classification based on an "accretion of duties." (Def.'s Ex. 17; Def.'s Facts ¶ 48; Pl.'s Resp. ¶ 48.) Once plaintiff confirmed that she wanted to pursue a desk audit, the IROR reorganization proposal was put on hold. Plaintiff's request for a desk audit was forwarded to State HR on February 5, 2009, but the desk audit did not commence until after IROR's move into RM/P. (Def.'s Ex. 47; Def.'s Facts ¶¶ 48, 49.) When it was finally completed in the late summer of 2009, the desk audit results did not support reclassification of plaintiff's position to GS-15. (Def.'s Facts ¶ 51.)

Following IROR's move into RM/P, plaintiff's job changed in a number of ways. First, Alba decided that a new position description was needed for plaintiff now that IROR was part of RM/P. (Def.'s Facts ¶ 53.) On July 30, 2009, he submitted his proposed position description

---

[9] OBO previously submitted a request to reorganize IROR and to reclassify plaintiff's position as a GS-15 in November 2007. (Def.'s Facts ¶ 38, at 1.) Upon its initial review, the classification staff at State HR concluded that the request was not supportable. (*Id*.) Before a final decision issued, Shinnick withdrew the request as it was did not reflect IROR's move into RM. (*Id*.)

("PD") to State HR for review (Def.'s Ex. 40), and on November 5, 2009, State HR gave its approval of the PD. (Def.'s Ex. 42; Def.'s Facts ¶ 53; Pl.'s Resp. ¶ 53; Pl.'s Facts ¶ 36.) Plaintiff only learned that her position description had been changed on December 2, 2009, when she received a "Notification of Personnel Action" email. (Pl.'s Ex. 20.) Although the new PD made no change to plaintiff's GS-14 grade level, it differed from the prior PD in the following ways: (1) in "Major Duties and Responsibilities," the new PD stated that IROR's reviews and analyses would be assigned by the RM/P Office Director (Alba); (2) in "Organizational Setting," the new PD stated that plaintiff's position "is accountable to a GS-15 position," whereas her previous PD reflected that she reported to a "SES or higher level position," and (3) in "Supervisory/Managerial Authority Exercised," the new PD specified that Alba was responsible for approving decisions regarding IROR staffing levels, resource allocation, and the methodologies for achieving work goals and objectives. (Pl.'s Resp. ¶¶ 53-56; Pl.'s Facts ¶¶ 36-39.) The changed position description took effect on December 6, 2009.

Alba also took several actions that plaintiff perceived as unfair and unwarranted. For example, he assigned work directly to one of plaintiff's subordinates, Ken Feng (Asian male), rather than assigning the work to IROR and letting plaintiff decide to whom it should be assigned. (Pl.'s Ex. 16.) Later, on October 21, 2009, Alba notified plaintiff that her "supervisory and COR responsibilities" over Feng were being removed based on Feng's allegations, as described by Alba, that plaintiff "attempted to bully him into making a false statement, that [she] engaged in retaliation against him, and that the supervisor/employee relationship between the two of [them] has deteriorated to such an unacceptable level that he can no longer continue to work effectively." (Pl.'s Ex. 27, att. 1.) In her annual performance reviews, Alba rated plaintiff as "Fully Satisfactory," yet prior to IROR's move into RM/P,

plaintiff consistently earned performance appraisals at the "Outstanding" level, including one from Shinnick for the eight month time period in 2008 that he supervised her. (Def.'s Ex. 24 & Pl.'s Ex. 17; Miles Decl. ¶ 6) When Alba provided plaintiff with her performance review for 2009, she questioned how he could provide her with a review having never given her work elements or a mid-year review. (Pl.'s Ex. 29, att. 1.) Alba also directed plaintiff not to contact certain offices and individuals without his "specific authorization" even though she believed that such contacts were required by her position description." (Pl.'s Ex. 29.)

Finally, after the move into RM/P, IROR's workload declined to the point where there was not enough work to keep plaintiff or her staff busy.[10] (Def.'s Facts ¶ 59; Pl.'s Resp. ¶ 59; Pl.'s Facts ¶¶ 26-28.) The parties dispute precisely how many reviews or audits IROR performed prior to and after the move into RM/P, but agree that the overall number significantly declined. (Def.'s Facts ¶ 59; Pl.'s Resp. ¶ 59; Pl.'s Facts ¶ 26.) Plaintiff began complaining about the lack of work shortly after IROR's move to RM/P. (Pl.'s Facts ¶ 31.) She complained to both Hochuli and Alba and, eventually, to the new OBO Director, Adam Namm. (Pl.'s Facts ¶ 31; Pl.'s Ex. 16.) Over the next several years, plaintiff repeatedly requested, without success, additional work and suggested projects for IROR. (Pl.'s Exs. 16 & 28, att. 2; Pl.'s Facts ¶ 31.) When vacancies developed within IROR, plaintiff requested, but was not given, permission to fill them. (Pl.'s Facts ¶¶ 31; Def.'s Resp. ¶ 31.) By 2011, IROR had only two employees other than plaintiff, even though there was a staff ceiling of eight. (Pl.'s Facts ¶ 32.)

In the fall of 2010, State OIG began its "Compliance Follow-up Review" of OBO. (Pl.'s Ex. 26 ("OIG Compliance Report"); Def.'s Facts ¶ 57.) The OIG's Compliance Report, which

---

[10] The parties agree that neither Shinnick, Hochuli, nor Stallman anticipated this decline (Pl.'s Facts ¶¶ 10-12), but disagree as to why it occurred. (*See* Pl.'s Facts ¶¶ 26-29; Def.'s Resp. ¶¶ 26-29.)

was issued in May 2011, concluded that OBO "was substantially in compliance with the recommendations in the [OIG Report]" and that "[i]nternal reorganization and changes in senior leadership have improved interactions between OBO and Department of State entities and other agencies." (OIG Compliance Report at 1.) With respect to IROR, the reviewers interviewed Alba, Hochuli, Stallman, Feng and Warrington "Pete" Brown, another IROR staff member. (Pl.'s Facts ¶ 41; Pl.'s Ex. 35.) Based on those interviews, they included the following observations in their report:

> According to OBO and the IR director, the workload in IR is insufficient and uneven; consequently, staff is not always fully employed. The OIG notes that given recent U.S. Government Accountability Office reviews of OBO's activities, OBO's overseas financial review program, the OIG's OBO inspection and this compliance follow-up review, the need for internal IR reviews has apparently diminished.

> At the same time, OBO told the OIG [review] team that other analysts in the Office of Policy and Program Analysis [RM/P] are sometimes overworked as a result of staffing shortages. To balance the workload more effectively, on occasion, the IR staff has been assigned non-internal review work.

(OIG Compliance Report at 9-10.) The report's recommendation was that OBO "should abolish the separate internal review function and assign its staff members to other [OBO] offices in order to distribute the workload more equally among all the analysts." (OIG Compliance Review at 10; Def.'s Facts ¶¶ 57, 60; Pl.'s Resp. ¶¶ 57-60.) In July 2011, OBO notified State OIG that it "agrees with [its] observation that, given the recent U.S. Government Accountability Office reviews of OBO's activities, OBO's financial review program, and the OIG's OBO inspection and Compliance Follow-up Review, the need for internal IR reviews is limited" and, thus "agrees with OIG's recommendation to abolish [IROR]." (Def.'s Ex. 50 & Pl.'s Ex. 24, at 1; Def.'s Facts ¶ 61; Pl.'s Resp. ¶ 61; Pl.'s Facts ¶ 40.) In November 2011, plaintiff was reassigned to a non-supervisory GS-14 position as a "senior management and program analyst" within RM/P.

(Def.'s Ex. 44; Def.'s Facts ¶ 61; Pl.'s Facts ¶¶ 40, 54.)  In January of 2012, IROR was officially abolished.

## II.    PROCEDURAL HISTORY

On February 25, 2009, two days after she learned that IROR would be moved into RM/P, plaintiff initiated EEO counseling.  (Pl.'s Ex. 13; Def.'s Facts ¶ 62; Pl.'s Facts ¶¶ 57-59.)  The report completed by the EEO Counselor indicates that the immediate impetus for the counseling was an exchange that plaintiff had with Shinnick on February 24, 2009, during which he "publicly bullied" her.  (Pl.'s Ex. 13.)  According to the EEO report, plaintiff believed that she was being harassed and otherwise discriminated against by Shinnick and others because she was a "female in a predominately male work environment."  (*Id*.)  She told the counselor that she was "uncomfortable with her chain of command, all males, as she feels these individuals support Mr. Shinnick's actions."  (*Id*.)  The EEO report also states that plaintiff complained that she had been "promised" a promotion to GS-15 within OBO but that "her chain-of-command is not honoring that promise."  (*Id*.)  Plaintiff told the counselor that the relief she sought was a promotion to GS-15 and to "[h]alt plans to move her to report to Isaias Alba."  (*Id*.)

In an attempt to informally resolve plaintiff's complaint, the EEO counselor met with Stallman, Shinnick and Montgomery, but not Hochuli or Alba.  (*Id.*; Def.'s Facts ¶ 63.)  During these discussions, the EEO counselor was made aware of OBO's recent reorganizations, the possibility that IROR would be assigned a new GS-15 position, and plaintiff's ongoing desk audit.  (Pl.'s Ex. 13.)  After plaintiff received the March 5, 2009 memo from Hochuli, she provided a copy to the EEO counselor and "expressed concern that the memo was a retaliatory move due to her pending discrimination complaint."  (*Id*.)  Based on her discussions with plaintiff and others, the EEO counselor concluded that informal resolution of plaintiff's

complaint was not possible.  (*Id.*)  She issued her final report, along with a notice to plaintiff that she had the right to file a formal discrimination complaint.  (*Id.*; Def.'s Facts ¶ 64.)  The notice stated that the EEO counselor had investigated the allegation of "hostile work environment harassment based on the fact that [plaintiff] is female in a predominately male work environment," and that the March 5, 2009 letter from Hochuli, citing possible disciplinary action, was "an effort to retaliate against her as a result of her pending discrimination complaint," and included boilerplate language advising her that she "must limit any formal EEO complaint . . . to those matters you discussed with me, or to like or related matters (that is, matters which are directly related to those matters or which are unmistakably derived from those matters discussed with me)."  (Pl.'s Ex. 13.)

On March 25, 2009, plaintiff filed a formal complaint of discrimination with the State Department's Office of Civil Rights, alleging, *inter alia*, that she had "been subjected to a hostile work environment and harassed based on the fact that I am a female and of black origin in a predominately male work environment"; that she was "uncomfortable with her chain of command who are all males, and feel these individuals support Mr. Shinnick's actions against me and have a bias against women as co-equals"; that she had been "place[d] several rungs down the pecking order"; and that she had been "the only black female in senior management who reported directly to Shinnick, but [she] was demoted and humiliated."  (Pl.'s Ex. 14; Def.'s Facts ¶ 65; Pl.'s Facts ¶¶ 61-62.)  The relief she requested included "[i]mmediate removal of [IROR] from under RM and placed back under the new Director of OBO."  (Pl.'s Ex. 14.)

On April 10, 2009, the State Department's Office of Civil Rights sent plaintiff a letter advising her that it had "identified the following specific allegations for investigation":  (1) race and sex discrimination based upon the removal of her duties and responsibilities; (2) race and sex

discrimination based upon the denial of a promotion; and (3) race and sex discrimination and reprisal based on a hostile work environment. (Pl.'s Ex. 15; Pl.'s Facts 65.)

In October 2009, plaintiff requested a hearing before the EEOC on her pending complaint. (Pl.'s Facts ¶ 66.) On November 6, 2009, January 13, 2010, and April 1, 2010, plaintiff asked the administrative law judge assigned to her case to amend her complaint to add new claims of discrimination and reprisal that were "like or related to" her pending claims. (Pls.' Exs. 27-29; Pl.'s Facts ¶ 66.) Plaintiff sought to include claims relating to the following: (1) the October 22, 2009 removal of her "supervisory and COR responsibilities" over her subordinate Feng; (2) IROR's "not receiving assignments from her supervisor, Isaias Alba"; (3) her "not being given work elements, a performance plan or a mid-year review"; (4) her "not being allowed to recruit and hire staff for her office"; (5) her new PD, which was issued "without her knowledge" and "d[id] not appear to support [her] grade"; (6) her March 10, 2010 performance appraisal that rated her as "fully successful," although "she ha[d] not been given work elements, a performance plan or a mid-year review for the rating period (March 2, 2009 – December 31, 2009)" and she "ha[d] not been given assignments by her supervisor"; (8) her supervisor's refusal "to allow her to fill vacancies in her office"; and (9) her supervisor's directive that she "not to contact certain offices and individuals without his 'specific authorization' which contact[s] are required by her Position Description." (Pl.'s Exs. 27-29.)

On July 19, 2011, after learning of OBO's decision to abolish IROR, plaintiff initiated a second round of EEO counseling, claiming that the decision to abolish IROR was another act of race or sex discrimination or retaliation. (Def.'s Ex. 47.) Plaintiff further claimed that "[p]rior to the decision to abolish her work unit, . . . management engaged in a pattern of discriminatory behavior by prohibiting her office from conducting management controls reviews" and by

"fail[ing] to provide her office with adequate work, even when sufficient work was available."
(*Id.* at 2.)  As a remedy, plaintiff sought for IROR "to be retained and/or reconstituted, permitted to fully staff-up, and given meaningful job assignments" and that "IR report directly to the Deputy Director of OBO, rather than the current management chain."  (*Id.* at 3.)  The counselor contacted Hochuli and Alba.  (*Id.* at 4.)  Hochuli  responded to the counselor's inquiry by providing a copy of the OIG Compliance Report and his July 15, 2011 memo accepting the recommendation to abolish OBO.  (*Id.*)  Alba responded that he considered Hochuli's response to be the official OBO response.  (*Id.*)

Plaintiff filed her initial complaint in federal court on December 9, 2010, claiming race discrimination (Count I), sex discrimination (Count II), race plus sex discrimination (Count III), and retaliation (Count IV), each claim based on "one or more" allegedly discriminatory or retaliatory actions that occurred between August 2008 and December 2010.  (Compl., Dec. 9, 2010 [ECF No. 1].)  She has since amended her complaint twice, each time with defendant's consent, to add actions that occurred after December 2010 and to withdraw the claim that she had been denied a promised promotion to a GS-15 grade position.  (*See* First Am. Compl., Sept. 21, 2011; 2d Am. Compl., Aug. 7, 2012).

As amended, plaintiff's complaint alleges that she was discriminated against on the basis of her race or sex or both when defendant

> reassigned her to a new GS-14 Position Description; placed several layers of supervision between her and the OBO Director; removed plaintiff's job duties, including some of her supervisory duties; reclassified her as 'staff'; failed to give IROR adequate work; prevented plaintiff from filling vacancies in IROR; prohibited her from attending senior management meetings; transferred the work of IROR to a former subordinate of plaintiff's; reassigned plaintiff's administrative assistant; denied plaintiff deserved cash awards; mischaracterized plaintiff's performance in her annual appraisals; removed privileges associated with being a senior manager; and harmed her opportunities for future promotion[,]

. . . and abolished IROR (now called "IR"), along with plaintiff's position as head of that group, and reassigned her to a non-supervisory Senior Analyst position.

(2d Am. Compl. ¶¶ 38, 44, 50.) The complaint alleges that she was retaliated against for engaging in protected activity when defendant

removed plaintiff's materially significant job duties, including some of her supervisory duties; failed to give IROR adequate work; prevented plaintiff from filling vacancies in IROR; transferred the work of IROR to a former subordinate of plaintiff's; failed to give plaintiff work elements, a performance plan, or a mid-year review; prevented plaintiff from carrying out her job duties; [] mischaracterized plaintiff's performance in her annual appraisals[,] . . . [and] abolished IROR (now called "IR"), along with plaintiff's position as head of that group, and reassigned her to a non-supervisory Senior Analyst position.

(2d Am. Compl. ¶ 56.)

After the completion of discovery, defendant filed the pending motion for summary judgment.

## ANALYSIS

A district court may grant summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "material fact is one that 'might affect the outcome of the suit under governing law.'" *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011) (quoting *Anderson v. Liberty Lobby*, 477 U.S. at 248). For a dispute about a material fact to be "genuine," the evidence must be such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. at 248. In ruling on a motion for summary judgment, a court must "view all facts and draw all reasonable inferences in favor of the nonmoving party." *Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004); *Youngberg v. March*, 676 F.3d 1114, 1117 (D.C. Cir. 2012). A court should

grant summary judgment only if "no reasonable jury could reach a verdict in [the non-moving party's] favor." *Jones v. Bernanke*, 557 F.3d 670, 674 (D.C. Cir. 2009).

Based on plaintiff's response to defendant's motion for summary judgment, it appears that the contested issues are whether defendant is entitled to summary judgment on (1) plaintiff's discrimination claims that relate to the realignment of IROR into RM/P and the abolishment of IROR; (2) plaintiff's retaliation claims that relate to the abolishment of IROR; and (3) plaintiff's retaliatory hostile work environment claim.[11] (Pl.'s Opp. at 21, 28, 35-36.) Defendant argues that it is entitled to summary judgment on plaintiff's discrimination claims because: (1) plaintiff failed to administratively exhaust any claim based on the realignment of IROR into RM/P; (2) the realignment of IROR into RM/P was not an "adverse employment action"; and (3) the realignment of IROR into RM/P, the abolishment of IROR and the reassignment of plaintiff to a non-supervisory position description were all actions taken for legitimate, non-discriminatory reasons that plaintiff cannot show are pretextual. Defendant argues that it is entitled to summary judgment on plaintiff's retaliation claims because (1) the abolishment of IROR and the reassignment of plaintiff to a non-supervisory position description were actions taken for legitimate, non-retaliatory reasons that plaintiff cannot show are pretextual; and (2) plaintiff's retaliatory hostile work environment fails because it was raised for the first time in her response to defendant's motion for summary judgment and, even if considered, would fail on the merits.

## I.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

Before bringing suit under Title VII, a plaintiff must timely exhaust her administrative remedies. *See* 42 U.S.C. § 2000e–16(c); *Harris v. Gonzales*, 488 F.3d 442, 443 (D.C. Cir. 2007).

---

[11] As explained herein, the issues before the Court have narrowed because plaintiff does not contest that defendant is entitled to summary judgment on certain claims, *see infra* notes 12, 14, 16, while defendant does not rebut certain of plaintiff's arguments. *See infra* note 13.

For a federal employee, administrative exhaustion requires the employee to seek informal pre-complaint counseling "within 45 days of the allegedly discriminatory act" "in order to try to informally resolve the matter," and to limit any subsequent formal EEO complaint to "only the claims raised in pre-complaint counseling (or issues or claims like or related to issues or claims raised in pre-complaint counseling)." *See* 29 C.F.R. §1614.105(a)(1) & (b)(1). Relying on this rule, defendant argues that even though plaintiff sought informal counseling within 45 days of the decision to realign IROR into RM/P (indeed, she made her first EEO contact only 2 days after she learned of the planned move), she failed to exhaust her discrimination claims based on that action because she failed to specifically identify it as an allegedly discriminatory act during informal counseling.[12] In the alternative, defendant argues that plaintiff failed at least to exhaust her race discrimination claims because during that same informal counseling session, she identified only sex, not race, as the type of discrimination she believed she had experienced.[13]

Neither argument is persuasive. First, the exhaustion cases cited by defendant (see Def. Mem. at 10) are not dispositive as they are all cases where informal counseling was untimely or

[12] Defendant also argues that plaintiff failed to exhaust her claims based on IROR's move into RM (standing alone), plaintiff's exclusion from senior staff meetings, the failure to nominate plaintiff for a cash award, and the reassignment of her administrative assistant because those actions that occurred more than 45 days prior to February 25, 2009, her first EEO contact. (Def.'s Mem. at 9.) Plaintiff does not respond to this argument, thereby conceding that she failed to exhaust and that defendant is entitled to summary judgment on these claims.

[13] Initially, defendant also argued that plaintiff never sought informal counseling as to her claims based on the direct assignment of work to her subordinate Feng, the prohibition on her communicating with the State Office of Strategic Planning and her year-end performance appraisals. (Def.'s Mem. at 10.) Plaintiff countered that informal counseling was not required because these claims were "like or related to" claims in her pending EEO complaint and her counsel had followed the proper procedures to amend her complaint to add these claims. (Pl.'s Opp. at 21.) Defendant has failed to rebut this argument, which is supported by the evidence. (*See* Pls.' Exs. 27-29.) Thus, the Court concludes that these claims were exhausted. However, defendant is entitled to summary judgment on other grounds. *See infra* note 14.

did not occur at all. *See, e.g.*, *Greer v. Paulson*, 505 F.3d 1306, 1316-17 (D.C. Cir. 2007) (no exhaustion of termination claim due to failure to meet with EEO counselor within 45 days). Nor is this a case where the claims were not raised in the employee's formal administrative complaint. Rather, defendant seeks to prevent plaintiff from bringing claims based solely on her failure to expressly identify during informal counseling the precise action or legal theory that she thereafter raised in her formal EEO complaint and in her district court complaint.

The purpose of informal EEO counseling is "clear from the text of the regulation: Counseling is designed to enable the agency and its employee 'to try to informally resolve the matter' before an administrative charge is filed." *Artis v. Bernanke*, 630 F.3d 1031, 1034 (D.C. Cir. 2011) (quoting 12 C.F.R. § 268.104(a) (comparable informal counseling requirement for Federal Reserve employees")); *see also Blackmon–Malloy v. United States Capitol Police Bd.*, 575 F.3d 699, 711–12 (D.C. Cir. 2009) ("[U]nlike agency exhaustion in other contexts, the purposes of counseling and mediation are not to compile a record for judicial review but instead simply to afford the employee and the employing office an opportunity to explore and possibly resolve the employee's claims informally.") "Where counseling produces sufficient information to enable the agency to investigate the claim, that purpose has been served." *Artis*, 630 F.3d at 1035 (internal quotations omitted). "To hold otherwise would turn the informal counseling requirement into a trap for unwary counselees rather than a step toward remediation, and it would violate the principle that 'Title VII's exhaustion requirement should not be read to create useless procedural technicalities.'" *Id.* (quoting *President v. Vance*, 627 F.2d 353, 362 (D.C. Cir. 1980)).

The informal counseling process initiated by plaintiff on February 25, 2009, was sufficient to achieve this purpose. Plaintiff, like most employees, was not represented by counsel

during the informal counseling process and was thus dependent on the EEO counselor to both accurately report and fully investigate her claims. In this instance, although plaintiff did not expressly state that she believed the decision to move IROR into RM/P was itself a discriminatory action, it is evident that the IROR realignment was part of the problem she brought to the EEO counselor's attention. As reflected in the EEO counselor's report, the relief plaintiff sought for the perceived discrimination was a "promotion to GS-15" and to "[h]alt plans to move her to report to Isaias Alba." (Pl.'s Ex. 13.) The report also indicates that when the counselor met with Stallman, he explained that "OBO had been going through a reorganization over the past several months, the result of a change in senior leadership and a recent IG inspection of the Bureau." (*Id.*) Stallman also provided the counselor with an email from plaintiff to him in which she stated: "if Jurg dislikes me so much that he cannot have me working for him, you should give me the promotion I have earned and I will begin to look elsewhere for a position." (*Id.*)

Similarly, although plaintiff failed to identify "race" as a possible basis for her discrimination claim during informal counseling, that failure did not undermine the informal counseling process as there was no direct evidence of sex or race discrimination for the counselor to investigate. In addition, there is no legal authority supporting defendant's argument that employees must differentiate between ideologically distinct categories of discrimination during informal counseling. Although that principle been applied to a plaintiff's formal administrative complaint, *see, e.g.*, *Bell v. Donley*, 724 F. Supp. 2d 1, 9 (D.D.C. 2010) (plaintiff cannot administratively exhaust a claim of race discrimination by bringing a formal administrative complaint for sex discrimination based on the same underlying action); *Oliver v. Napolitano*, 729 F. Supp. 2d 291, 298–99 (D.D.C. 2010), *aff'd*, No. 11–5163, 2011 WL 6759576

(D.C. Cir. Dec. 8, 2011), there appears to be "no authority suggesting that the same level of exactitude is required at the informal counseling stage." *See Youssef v. Holder*, 881 F. Supp. 2d 93, 104 (D.D.C. 2012) (no failure to exhaust national origin discrimination claim where informal counseling covered retaliation claim based on same underlying action and both claims were raised in formal complaint).

The point of informal counseling is for an employee to "raise his concerns 'in a manner that lends itself to potential resolution.'" *Youssef* , 881 F. Supp. 2d at 104 (quoting *Artis v. Greenspan*, 158 F.3d 1301, 1306 (D.C. Cir. 1998)). Plaintiff easily "satisfied this lenient standard," *id.*, and, thus, she has exhausted her administrative remedies with respect to her race and sex discrimination claims based on the realignment of IROR into RM/P.

## II.   DISCRIMINATION CLAIMS

Defendant argues that it is entitled to summary judgment on plaintiff's discrimination claims because (1) the realignment of IROR into RM/P was not an "adverse employment action," and (2) the realignment of IROR into RM/P, the abolishment of IROR, and the assignment of plaintiff to a non-supervisory PD were all actions that were taken for legitimate, non-discriminatory reasons that plaintiff cannot show are pretextual.

### A.   Adverse Employment Action

"In order to present a viable claim of employment discrimination under Title VII, a plaintiff must show he suffered an adverse employment action." *Douglas v. Donovan*, 559 F.3d 549, 551-52 (D.C. Cir. 2009). An "'adverse employment action' is 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Id*. at 552 (quoting *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (other internal quotations

omitted). A plaintiff may demonstrate that she has suffered an adverse employment action by showing that she "'experienced materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm.'" *Id.* (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002)). "'[P]urely subjective injuries' such as dissatisfaction with a reassignment, or public humiliation or loss of reputation are not adverse actions." *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) (quoting *Forkkio*, 306 F.3d at 1130-31); *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001) ("not everything that makes an employee unhappy is an actionable adverse action"). But a "'reassignment with significantly different responsibilities' . . . generally indicates an adverse action." *Forkkio*, 306 F.3d at 1131 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

Defendant argues that IROR's realignment into RM/P does not qualify as an "adverse employment action" because "other than a change in her reporting relationship, [plaintiff's] position remained substantially the same when she moved into RM and then RM/P. Her salary and benefits did not change, she continued to supervise the IROR staff, and IROR staff continued to perform any internal reviews that were requested by OBO officials." (Def. Mem. at 14.)[14] Plaintiff does not dispute that a change in reporting relationship, standing alone, would not constitute an adverse employment action, but she disputes defendant's characterization of the

---

[14] Defendant also argues that several other actions do not qualify as "adverse employment actions": the mischaracterization of plaintiff's work in her annual performance appraisal; directly assigning work to plaintiff's subordinate Feng; and prohibiting plaintiff from communicating with the State Office of Strategic Planning. (Def. Mem. at 26-29.) Plaintiff failed to respond to these arguments, thereby conceding that defendant is entitled to summary judgment on plaintiff's discrimination claims based on these actions.

evidence, asserting that it is "indisputable that [her] job duties and responsibilities were diminished when she and IROR were moved under RM/P."[15] (Pl.'s Opp. at 25.)

As plaintiff rightly points out that "[w]hether a particular reassignment of duties constitutes an adverse action for purposes of Title VII is generally a jury question." (Pl.'s Opp. at 25 (quoting *Czekalski v. Peters*, 475 F.3d 360, 365 (D.C. Cir. 2007)). Moreover, in deciding whether defendant should prevail, the question for the Court is not whether plaintiff's view of the evidence is "indisputable," but rather whether a reasonable jury could find that the move into RM/P effected a "reassignment with significantly different responsibilities." Even though on paper there was no immediate change in plaintiff's job description, there is ample evidence supporting her contention that the move into RM/P resulted in a significant diminishment of her job duties. First, it is undisputed that the move into RM/P placed several additional layers of supervision between her and the OBO Director. In addition, the undisputed evidence supports her allegations that the move resulted in the removal of some of her job duties, including some of her supervisory duties, she was reclassified as "staff," IROR was not given adequate work, and she was not allowed to fill vacancies in IROR. Finally, Alba did rewrite plaintiff's PD, allegedly without her knowledge, and that the plain language of the new PD supports plaintiff's view that she had diminished supervisory responsibility following IROR's placement into RM/P. Thus, viewing the evidence in the light most favorable to the plaintiff, the Court concludes that the question whether IROR's realignment constituted an "adverse employment action" cannot be resolved on summary judgment.

_____

[15] Plaintiff does not try to argue that the move to RM by itself was an adverse employment action. Even if she did, that claim was not exhausted. *See supra* note12.

## B.    Discriminatory Motive

"In a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, . . . the district court must resolve one central question:  Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?"  *Brady v. Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).  That is, does the "employee's evidence creates a material dispute on the ultimate issue of [discrimination] either directly by [showing] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'"  *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009).  "In assessing the legitimacy of the proffered reason and the ultimate question of discrimination, the court looks to (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff ... or any contrary evidence that may be available to the employer."  *Grosdidier v. Broadcasting Bd. of Governors*, 709 F.3d 19, 25 (D.C. Cir. 2013)

Defendant has proffered legitimate, non-discriminatory reasons for the decisions to (1) realign IROR into RM/P; and (2) to abolish IROR and reassign plaintiff to a non-supervisory position description in November 2011.[16]  Plaintiff asserts that these reasons are pretextual.  The

---

[16] Defendant also proffers legitimate, non-discriminatory reasons for a number of other actions (*see* Def.'s Mem. at 27-29), which plaintiff does not challenge as pretextual.  Accordingly, defendant is entitled to summary judgment on plaintiff's claims based on those actions: the reassignment of plaintiff's administrative assistant; the direct assignment of work to Ken Feng

"central question" is thus whether plaintiff has produced evidence sufficient for a jury to find

"'that the defendant's explanation is unworthy of credence'" and that a jury could "'reasonably

infer from the falsity of the explanation that the employer is dissembling to cover up a

discriminatory purpose.'" *Primas v. District of Columbia*, 719 F.3d 693, 697 (D.C. Cir. 2013)

(quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000)).

    A plaintiff may try to show that the employer's stated reason for the employment action

was not the actual reason in a variety of ways, including evidence "that the employer treated

other employees of a different race, color, religion, sex, or national origin more favorably in the

same factual circumstances," "that the employer is making up or lying about the underlying facts

that formed the predicate for the employment decision," of "changes and inconsistencies in the

stated reasons for the adverse action," of an "employer's failure to follow established procedures

or criteria," of "the employer's generally negative treatment of minority employees,"; or of

"discriminatory statements by the decisionmaker." *Brady*, 520 F.3d at 495 & n.3; *see Czekalski*

*v. Peters*, 475 F.3d 360, 366 (D.C. Cir.2007) ("[O]ne way for a plaintiff to show that an adverse

employment decision was made for a discriminatory reason is to 'show[] that the

nondiscriminatory explanation the defendant proffered for its decision was false.'" (quoting

*Lathram v. Snow*, 336 F.3d 1085, 1089 (D.C. Cir. 2003)). "If the employer's stated belief about

the underlying facts is reasonable in light of the evidence, however, there ordinarily is no basis

for permitting a jury to conclude that the employer is lying about the underlying facts." *Brady*,

520 F.3d at 495; *see George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) ("[A]n employer's

---

and his subsequent removal from plaintiff's supervision; the refusal to allow plaintiff to hire
staff; annual performance appraisals rating plaintiff as "fully successful," instead of
"outstanding"; the failure to provide a mid-year review; plaintiff's exclusion from meetings; and
barring plaintiff from communicating with the Strategic Planning and Programming Office.
(Def. Mem. at 27-29.)

action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false."); *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (employer prevails if it "honestly believes in the reasons it offers").

## 1. IROR's Realignment in RM/P

Defendant's proffered legitimate, non-discriminatory reason for the decision to move IROR into RM/P is that the move occurred "in large part" because of "State HR's review of OBO's reorganization plan" and State HR's determination that to avoid a conflict of interest when reviewing the IRM, MSD and HR Divisions, all of whom reported to Director of the Executive Office, IROR should either report directly to RM Director Hochuli or be placed in RM/P. (Def. Mem. at 16.) Defendant acknowledges, as it must, that there were additional reasons given by Hochuli at the time the decision was made – that Hochuli decided to put IROR into RM/P because of RM/P's "traditional role" in conducting reviews and because he did not believe that he had sufficient time to adequately supervise IROR. (*Id.*; *see* Def.'s Facts ¶ 28 ("Hochuli decided that IROR should be incorporated into RM/P rather than report directly to him because RM/P had historically done similar work, IROR had operated in an isolated manner, and he wanted IROR to have day-to-day supervision, which he would have not have the time to devote given his existing responsibilities.").

Plaintiff contends that defendant's stated reasons for IROR's realignment are pretextual because they are "false." To demonstrate falsity, she correctly points out that there is evidence that "contradict[s] the claim that IROR was moved under RM/P due to a conflict of interest" and that undermines defendant's claim that IROR and RM/P historically did similar work. (Pl.'s Opp. at 22.) On the conflict of interest point, that evidence includes: (1) Shinnick's testimony during his deposition that he did not believe there was a conflict of interest in having IROR

26

reporting to the Executive Director (Shinnick Dep. at 55-56); (2) Hochuli's testimony that conflicts could arise with either placement, but that he could have avoided any actual conflicts no matter where IROR was placed simply by having the Inspector General handle the review (Hochuli Dep. at 77-83); and (3) Alba's testimony that RM/P was responsible for drafting and updating OBO's policies and procedures (Alba Dep. at 12), which plaintiff attests were routinely reviewed by IROR. (Miles Decl. ¶ 12.) On plaintiff's contention that IROR and RM/P have not historically performed similar work, the strongest evidence supporting plaintiff is that both Hochuli and Alba were unable to identify any reviews conducted by RM/P other than a few "workload studies" (Hochuli Dep. at 83-84; Alba Dep. at 21-23), which plaintiff asserts were not comparable to IROR's in-depth reviews. (Miles Decl. ¶ 13.)

Certainly, not all the evidence supports plaintiff's view. For example, Hochuli testified that there would also have been more of an "appearance" of a conflict if IROR were reporting to the Executive Director. (*Id*. at 78-79.) Nonetheless, viewing the evidence in the light most favorable to the plaintiff, the Court concludes that it is for the jury to decide if the proffered reasons for moving IROR into RM/P were the actual reasons for that decision or if defendant had some other non-discriminatory reason for its actions. *See Primas*, 2013 WL 3108668, at *4 (denying summary judgment but pointing out that "a jury could reasonably view the evidence differently and conclude that [the defendant] is telling the truth or, even if not, that she had some other non-discriminatory reason for her actions"). In addition, summary judgment is not appropriate "in a case that hinges on the answer to a question that itself hinges on credibility determinations more appropriately made from a jury's box than a judge's bench." *Id*. Here, one of the critical questions is whether Hochuli is telling the truth when he says he moved IROR into RM/P because of the OIG report and RM/P's related work, even if he was mistaken as to the

underlying facts.  Under these circumstances, though plaintiff's evidence is far from overwhelming, it is enough to preclude summary judgment.

### 2. Abolishment of IROR

Defendant's proffered legitimate, non-discriminatory reason for the decision to abolish IROR and reassign plaintiff to a non-supervisory position description is that "OBO abolished IROR as a separate function based on OIG's recommendation," which in turn was based on OIG's finding that "IROR's workload [was] 'insufficient and uneven,' resulting in staff 'not always fully employed,' whereas other RM/P staffers were 'sometimes overworked as a result of the staff shortages.'"  (Def. Mem. at 19 (quoting OIG Compliance Report at 9-10).)  Defendant further explains that the need for IROR's internal reviews had decreased because outside reviews had increased and "Hochuli did not see a need to impose yet another layer of reviews that would further tax OBO staff's time and resources" while RM/P's non-IROR employees . . . were stretched during 2010 reviewing and updating a large number of OBO policies and procedures."[17]  (Def. Mem. at 20.)

Plaintiff contends that these reasons are pretextual, relying on evidence that the only reason IROR lacked work was that Alba and Hochuli refused to authorize it to do anything, even after plaintiff's repeated requests, that arguably contradicts the claim that RM/P was overworked, and that the OIG's conclusions were not truly "independent," but rather based primarily on what Hochuli, Alba, and Stallman told the OIG reviewers during their interviews.  Based on this contrary evidence, the Court cannot grant summary judgment on plaintiff's discrimination claims that are based on the decision to abolish IROR and assign plaintiff to a non-supervisory position.

---

[17] Defendant relies on the same rationale for the reassignment of plaintiff to a non-supervisory position description.

## III.     RETALIATION CLAIMS

Plaintiff claims that defendant unlawfully retaliated against her after she filed her initial administrative complaint by subjecting her to discrete acts of retaliation and by subjecting her to a retaliatory hostile work environment.  For different reasons, defendant argues that it is entitled to summary judgment on both claims.

Title VII "prohibits employer retaliation when an employee . . . 'has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  *Grosdidier*, 709 F.3d at 23 (quoting 42 U.S.C. § 2000e–3(a)).  Title VII's ban on retaliation applies to federal employers through § 2000e–16.  *See Taylor v. Solis*, 571 F.3d 1313, 1320 (D.C. Cir. 2009).  "To sustain a prima facie case of unlawful retaliation, [a plaintiff] must show that the [defendant] took materially adverse action against him because he participated in protected activity."  *Bridgeforth v. Jewell*, No. 12-5015, 2013 WL 3305711, at *2 (D.C. Cir. July 2, 2013) (citing *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012)).  Title VII's retaliation provision is broader than the substantive antidiscrimination provisions in that it is "not limited to discriminatory actions that affect the terms and conditions of employment," but rather "prohibits any employer action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Thompson v. North American Stainless, LP*, 131 S. Ct. 863, 868 (2011) (quoting *Burlington N. & S.F.R. Co. v. White*, 548 U.S. 53, 64, 68 (2006)).  However, unlike discrimination claims, Title VII retaliation claims ultimately require proof that the desire to retaliate was the "but-for" cause of the challenged action.  *See University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

## A.  Abolishment of IROR

Defendant argues that it is entitled to summary judgment on plaintiff's retaliation claim based on the abolishment of IROR and the subsequent assignment of plaintiff to a non-supervisory position because (1) plaintiff "cannot state a prima facie case" as to causation and (2) the decision was made for legitimate, non-retaliatory reasons that plaintiff cannot show are pretextual.  (Def. Mem. at 22-23.)  Once a defendant proffers a legitimate, non-retaliatory explanation for a materially adverse action, as it has here, the question whether plaintiff has stated a prima facie case effectively evaporates, and the only question for the court on summary judgment is "'whether a reasonable jury could infer . . . retaliation from all the evidence.'" *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010) (quoting *Jones v. Bernanke*, 557 F.3d at 678).

Although plaintiff's discrimination and retaliation claims based on the abolishment of IROR are distinct and ultimately require proof of different facts, defendant's argument for summary judgment is the same.  (Def. Mem. at 23 ("plaintiff cannot show that OBO's reason for abolishing IROR was a pretext for retaliation for the same reasons that she cannot show that it was a pretext for discrimination").)  Having already decided that there is sufficient evidence of pretext to allow plaintiff's discrimination claim based on the abolishment of IROR to proceed, the same is necessarily true for her retaliation claim.  Accordingly, defendant is not entitled to summary judgment on this retaliation claim.

## B.  Retaliatory Hostile Work Environment

In plaintiff's opposition to defendant's motion for summary judgment she argues that in addition to discrete acts of retaliation, she was subjected to a series of actions that "cumulatively amounted to a retaliatory hostile work environment."  (Pl.'s Opp. at 37.)  The actions plaintiff

identifies as creating a retaliatory hostile work environment after IROR's move into RM/P include (1) that "she was reassigned to a new GS-14 PD with diminished supervisory responsibilities" ; (2) that "[a]fter having previously handled many complex reviews and audits, [plaintiff] and her staff were given almost no new work to perform for over two years"; (3) that "Alba undermined [plaintiff's] supervisory authority, going so far as to reassign one of her subordinates without even discussing it first with her"; (4) that she "received baseless annual performance appraisals at the 'Fully Satisfactory' level, whereas she had routinely received 'Outstanding' ratings previously"; and (5) that "IROR was abolished and [plaintiff] was stripped of all supervisory responsibility." (*Id.*) In its reply, defendant argues that plaintiff should not be allowed to pursue this claim because it was "raised for the first time" in plaintiff's opposition to defendant's motion for summary judgment and that "[t]he summary judgment stage is far too late in the day for [plaintiff] to inject a new claim into this case." (Def.'s Reply at 22.) In the alternative, defendant argues that even if plaintiff were permitted to raise a claim for a retaliatory hostile work environment "at this juncture," it would fail "as a matter of law." (Def.'s Reply at 22.)

Although the Court does not have the benefit of plaintiff's response to these arguments, none is needed. On both points, defendant's analysis is correct. To bring a claim for a retaliatory hostile work environment, a plaintiff must allege that the employer subjected him to "[retaliatory] intimidation, ridicule, and insult' of such 'sever[ity] or pervasive[ness] [as] to alter the conditions of [his] employment and create an abusive working environment.'" *See Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008); *Singletary v. District of Columbia*, 351 F.3d 519, 526 (D.C. Cir. 2003). First, it is clear that the plaintiff's

complaint does not include a claim based on a retaliatory hostile work environment. The complaint includes only a single retaliation claim, which alleges that plaintiff was subjected to "one or more materially adverse actions" that "were based on reprisal and were taken . . . as pretexts to retaliation." (2d Am. Compl. ¶¶ 56-57.) Nowhere in the complaint does it state that plaintiff believed she was subjected to a retaliatory "hostile work environment." Nor does the complaint allege that "the workplace [was] permeated with [retaliatory] intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" or facts that would support such a finding. Given plaintiff's failure to plead a retaliatory hostile work environment claim in her complaint (even after amending it two times), she may not raise it for the first time in response to a motion for summary judgment. *See Taylor v. Mills*, 892 F. Supp. 2d 124, 137 (D.D.C. 2012).

Even if plaintiff could include a retaliatory hostile work environment claim at this late date, defendant would be entitled to summary judgment. "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory [or retaliatory] conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch*, 550 F.3d at 1201 (citing *Faragher v. City of Boca Raton*, 534 U.S. 775, 787-88 (1998)). Given plaintiff's claims, a reasonable jury could not, as a matter of law, conclude that plaintiff's "workplace [was] permeated with [retaliatory] intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Rather, the acts of which plaintiff complains are primarily "work-related actions by supervisors" that "courts have generally rejected [as a basis for] hostile work environment claims." *Grosdidier v. Chmn., Bd. of Broadcasting Governors*, 774 F. Supp. 2d 76, 110-11 (D.D.C. 2011), *aff'd*, 709 F.3d 19

(D.C. Cir. 2013); *see Brooks v. Grundmann*, 851 F. Supp. 2d 1, 5-6 (D.D.C. 2012) (no retaliatory hostile work environment based on assignment of work to plaintiff that she believed was beneath her qualifications, negative performance reviews, and being yelled at by supervisor); *Douglas-Slade v. LaHood*, 793 F. Supp. 2d 82, 101 (D.D.C. 2011) (no retaliatory hostile work environment based on disagreement with supervisor's management style); *Hendricks v. Paulson*, 520 F. Supp. 2d 65, 95-100 (D.D.C. 2007) (no retaliatory hostile work environment based on criticizing plaintiff in performance reviews and micromanaging her"). Accordingly, defendant is entitled to summary judgment on plaintiff's retaliatory hostile work environment claim on the grounds that it is both untimely and without merit.

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is granted in part and denied in part as follows:

(1) Summary judgment is granted as to plaintiff's claims based on the following actions: IROR's move into RM (standing alone); plaintiff's exclusion from senior staff meetings; the failure to nominate plaintiff for a cash award; the reassignment of plaintiff's administrative assistant; plaintiff's annual performance appraisals; the direct assignment of work to plaintiff's subordinate; the prohibition on plaintiff communicating with the State Office of Strategic Planning; the refusal to allow plaintiff to hire staff; and the failure to provide a mid-year review.

(2) Summary judgment is granted as to plaintiff's retaliatory hostile work environment claim.

(3) Summary judgment is denied as to the remainder of plaintiff's claims, specifically her discrimination claims based on the realignment of IROR into RM/P, and her discrimination and

retaliation claim based on the abolishment of IROR and her assignment to a non-supervisory position description.

A separate Order accompanies this Memorandum Opinion.


_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date: August 21, 2013